UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEREMY POPOFF, ALAN POPOFF, KEVIN BALDES and THE ALLEN SHELLENBERGER LIVING TRUST,<br><br>    Plaintiffs<br><br>v.<br><br>SONY MUSIC ENTERTAINMENT INC.,<br><br>    Defendant | Civil Action No. -cv- ( )<br><br>**JURY DEMAND** |

# COMPLAINT

Plaintiffs, Jeremy Popoff, Alan ("Ajay") Popoff, Kevin Baldes and the Allen Shellenberger Living Trust p/k/a *LIT* (collectively, "Plaintiffs"), by and through the undersigned counsel, provides the following Complaint against Defendant Sony Music Entertainment Inc. ("SME" or "Defendant"):

## Parties

1. Plaintiff Jeremy Popoff is a citizen and resident of Nashville, Tennessee. Jeremy Popoff is a party to the October 2, 1998 Exclusive Recording Agreement with RCA Records, a division of Defendant Sony Music Entertainment Inc. (the "1998 Agreement"). A true and correct copy of the 1998 Agreement is attached as Exhibit A to this Complaint.

2. Plaintiff Alan Popoff is a citizen and resident of Nashville, Tennessee and a party to the 1998 Agreement. (*Id.*)

3. Plaintiff Kevin Baldes is a citizen and resident of California and a party to the 1998 Agreement. (*Id.*)

4. Plaintiff the Allen Shellenberger Living Trust is the successor-in-interest to Mr.

1

Shellenberger and resides in California. Mr. Shellenberger was a party to the 1998 Agreement. (*Id.*)

5. Defendant Sony Music Entertainment Inc. is the successor-in-interest to RCA Records under the 1998 Agreement and operates thereunder though its record label, RCA Records. Sony Music Entertainment Inc. has a principal place of business at 25 Madison Avenue, New York, New York 10010.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 as there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

7. This is the proper venue for this action under 28 U.S.C. § 1391(b) because Defendant resides in this District, a substantial part of the events giving rise to this action occurred in this District and Division and the 1998 Agreement contains a mandatory forum-selection clause requiring any litigation arising under the Agreement be filed in New York state or federal court.

## FACTUAL ALLEGATIONS

8. Plaintiffs formed the band that eventually became known professionally as *LIT* in 1988 in Orange County, California and released their first full album on the record label *Malicious Vinyl* in 1997.

9. On October 2, 1998, Plaintiffs signed a multi-album exclusive recording agreement with RCA Records, a division of SME (the "Agreement"). (A true and correct copy of Plaintiffs' 1998 Exclusive Recording Agreement with Defendant is attached to this Complaint as Exhibit A).

10. Shortly thereafter, in February of 1999, LIT released its second album *A Place in the Sun*, the success of which propelled Plaintiffs into worldwide popularity with the widely

successful hit single "My Own Worst Enemy." The hit single received the Billboard Music Award for the biggest modern rock song of 1999 and remained on the Billboard Music Chart for a total of 11 weeks that year. LIT also charted with singles "Ziplock" and "Miserable" from *A Place in the Sun*.

11. Fueled, in large part, by the success of the single "My Own Worst Enemy," *A Place in the Sun*, represented the band's best-selling album and was quickly certified platinum in the United States and gold in Canada.

12. Although first released over twenty-six years ago, *A Place in the Sun*, and specifically "My Own Worst Enemy," continue to generate significant revenue for Defendant with the latter having been streamed over 500,000,000 times on Spotify alone since its release on February 22, 1999.

13. LIT has been a touring mainstay and continues to perform live performances each year. As a result, Defendant continues to reap the financial benefits under the Agreement from the pinnacle of the Band's creative output and decades of subsequent effort by the Band to present their music to new generations of music fans.

14. Defendant, however, has failed and/or refused to live up to its end of the "bargain" in consideration of the uniquely one-sided nature of Defendant's recording agreements. Specifically, Defendant has failed to account to Plaintiffs for significant streaming income, among other deficiencies, for decades with full knowledge of the vast number of similarly situated artists materially impacted by Defendant's intentional breaches of its own contractual language.

15. Artists such as Plaintiffs critically rely on royalties such as those at issue in this litigation for their careers and family.

16. The inaccuracy of Defendant's royalty accountings and resulting underpayments

to Plaintiffs under the Agreement also artificially depressed Plaintiffs' corresponding contributions to SAG/ AFTRA, which impacted both Plaintiffs' pensions, but more urgently Plaintiffs' eligibility for health insurance under SAG/AFTRA that is determined by the amount of royalty earnings reported to SAG/AFTRA by Defendant.

17.     In May 2023, Plaintiffs learned that Defendant had erroneously accounted to Plaintiffs in breach of its obligations under the 1998 Agreement in at least three material respects, and Plaintiffs first notified Defendant of such erroneous accounting objections in July 2023.

### Audio Streaming

18.     First, SME incorrectly calculated royalties for the streaming of master recordings covered by the 1998 Agreement (the "Subject Master Recordings") at a Basic U.S. Royalty Rate of 14% in lieu of a "Net Receipts" basis as required under section 9.01 of the 1998 Agreement:

> 9.01.  RCA shall accrue to your royalty account, in accordance with the provisions of Article 11 below, royalties as described below; provided, however, no royalties shall be due and payable to you until such time as all Advances have been recouped by or repaid to RCA. Royalties shall be computed by applying the applicable royalty percentage rate specified below in this Article 9 to the applicable Royalty Base Price in respect of Sales of Records described in the paragraph (or subparagraph) concerned, **except where such royalties are accrued on a Net Receipts basis for which the provisions of paragraph 14.20 below shall govern**.

(emphasis supplied).

19.     Section 9.08 of the 1998 Agreement makes clear that the streaming, as opposed to the digital download, of a Subject Master Recording requires SME to calculate royalties payable to Plaintiffs on a "Net Receipts" basis due to the nature of the licensing relationship between SME and the DSPs:

> (b) Provided that a royalty or other payment is not otherwise provided for such uses elsewhere in this Article 9, including, without limitation, pursuant to paragraph 9.08(a) above, in respect of any Master Recording licensed by RCA to another

      Person which is equivalent in nature to a sale or other distribution of a Record (e.g. RCA's license to another Person of the right to make a so-called "<u>digital download</u>" of a Record), for which license RCA receives a royalty or other payment that is readily and directly attributed to the use of such Master Recording (the "Per-Use Fee"), RCA shall credit your royalty account hereunder with an amount equal to a percentage of RCA's Net Receipts from such Per-Use Fee which is the same as the percentage of the applicable Basic U.S. Rate or Foreign Rate for Albums sold for distribution in the country concerned. **If any such license of a Master Recording is not equivalent to the distribution of a Record, <u>but rather is equivalent in nature to a master use or synchronization license (e.g., RCA's license to another Person of the right to embody a Master Recording on a website in a so-called "streaming" format, which is not subject to the "digital download" of that Master Recording by a viewer</u>), RCA shall credit your royalty account hereunder with an amount equal to fifty percent (50%) of RCA's Net Receipts from such Per-Use fee.**

(emphasis supplied).

      20.    Section 7.01 of the 1998 Agreement defines a "Master Recording" as follows:

      Each Recording made by you or Artist during the Term and each Recording furnished to RCA by you or the Artist under this agreement or during the Term (a "Master Recording" hereunder)

      21.    By contrast, the 1998 Agreement defines a "Video" as an "audiovisual work owned or controlled by RCA featuring primarily, the audio soundtrack of one (1) or more Master Recordings hereunder." (Exh. A, §14.37)

      22.    Because SME received and continues to receive streaming income from the Master Recordings pursuant to licenses it granted to digital service providers ("DSPs"), SME must calculate streaming royalties owed Plaintiffs for the Subject Master Recordings on a "Net Receipts" basis pursuant to the plain language of the Agreement.

      23.    SME's failure and/or refusal to account properly to Plaintiffs for streaming royalties received from licenses from third-party DSPs under the 1998 Agreement has damaged Plaintiffs in excess of $800,000 in underpaid royalties as reflected on royalty statements rendered from January 1, 2021 through December 31, 2026 (the "Review Period).

**Video Streaming**

24. Second, SME incorrectly calculated royalties for the streaming of audiovisual works owned or controlled by RCA featuring primarily, the audio soundtrack of one (1) or more Subject Master Recordings at approximately 17% in lieu of a calculation based on 50% of "Net Receipts" as required under Section 9.07(b)(1) (i.e., uses of Videos for which RCA receives revenues other than those described in Section 9.07(a) [e.g., Sales of Video Records]). (Exh. A § 9.07(b)(1)).

25. Because SME received and continues to receive streaming income from Videos pursuant to licenses it granted to DSPs, SME must calculate streaming royalties owed Plaintiffs for the Videos on a "Net Receipts" basis under the Agreement.

26. SME's failure and/or refusal to account properly to Plaintiffs for Video streaming royalties received from licenses from third-party DSPs under the 1998 Agreement has damaged Plaintiffs in additional underpaid royalties during the referenced period as reflected on royalty statements rendered for the Review Period.

**Escalated Royalty Rate for the album *A Place in the Sun***

27. Third, SME has failed and/or refused to apply the proper escalated royalty rate for sales of the album *A Place in the Sun* once the relevant sales exceeded 500,000 (gold) and 1 million units (platinum) respectively.

28. Specifically, under the 1998 Agreement, once an album exceeds 500,000 units sold, the applicable royalty rate would escalate from 14.0% to 14.5%. Similarly, once 1 million units of an album under the 1998 Agreement are sold, the applicable royalty rate escalates from

14.5% to 15%, both for sales of physical product and digital downloads. (Exh. A to Complaint, § 5(c)),

29. Once *A Place in the Sun* achieved platinum thresholds for album sales under the 1998 Agreement, SME was contractually obligated to account to Plaintiffs at the escalated 15% royalty rate for U.S. sales and/or digital downloads during the Review Period.

30. SME failed to pay Plaintiffs the escalated 15% royalty rate for U.S. sales and/or digital downloads of the album *A Place in the Sun* during the Review Period as called for in section 5(c) of the 1998 Agreement.

31. Beginning in July 2023, and continuing through 2025, Plaintiffs attempted to get SME to address its clear breaches of its accounting obligations to Plaintiffs under the 1998 Agreement described herein. SME, however, initially merely provided a half-hearted defense of its position on audio streaming, and beginning in late-April 2024 Defendant refused even to respond to multiple communications from Plaintiffs' counsel for the remainder of that calendar year.

32. During the entirety of this dispute, SME has never provided a coherent position supporting its "interpretation" of the streaming provision at issue.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

33. The allegations in Paragraphs 1 – 32 are reincorporated in this Paragraph.

34. The 1998 Agreement is a valid and enforceable agreement supported by consideration.

35. SME's failure to calculate royalties resulting from the licensing of the Subject Master Recordings for streaming with the DSPs during the Review Period based on Net Receipts as required in section 9.08 of the 1998 Agreement constitutes a material, uncured breach of SME's

7

obligations thereunder.

36. SME's failure to calculate royalties resulting from the licensing of the Subject Videos for streaming with the DSPs during the Review Period based on Net Receipts as required in section 9.07(b)(1) of the 1998 Agreement constitutes an additional material, uncured breach of SME's obligations thereunder.

37. SME's failure to calculate royalties payable to Plaintiffs during the Review Period resulting from the sales and digital downloads of the 1999 album *A Place in the Sun* at the escalated 15% royalty rate also constitutes a material, uncured breach of SME's obligations under the 1998 Agreement.

38. As a result of SME's breaches of the 1998 Agreement as detailed herein, Plaintiffs have been damaged in excess of $800,000 in unpaid royalties during the Review Period.

39. Plaintiffs have suffered other consequential damages from SME's material, uncured breaches of the 1998 Agreement, including, without limitation, reduction in pension contributions and increased health insurance premiums for health insurance coverage outside of SAG/AFTRA.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following:

(a) That SME be ordered to pay all damages incurred by Plaintiffs during the Review Period because of SME's breaches of its royalty accounting obligations to Plaintiffs under the 1998 Agreement;

(b) For an award of Plaintiffs' costs and expenses incurred in pursuing this action, as well as all reasonable attorneys' fees incurred therewith;

(c) For an award of pre-judgment and post-judgment interest; and

(d) For any further or additional relief that justice requires.

**JURY DEMAND**

Plaintiffs request a trial by jury for all issues, claims, and defenses so triable

Respectfully submitted,

*/s/ Chris L. Vlahos*
Chris L. Vlahos (NY #5965041)
Vlahos Law LLC
1030 16th Avenue S, Suite 200
Nashville, TN 37212
(615) 400-3213
chris@vlahos-law.com

*Attorney for Plaintiffs Jeremy Popoff, Alan ("Ajay") Popoff, Kevin Baldes and the Allen Shellenberger Living Trust p/k/a LIT*

DATED: March 2, 2026